2-0-9-0-3-9-8 Four Seasons Heating and Plumbing v. Schock Board and your honors, counsel, may it please the court, my name is George Klauke on behalf of Four Seasons Heating and Plumbing. This case is a manifest way to the evidence question. There are two issues that I'd like to address, the first of which is the TTD award. This cannot be supported by the record and I would cite to you page C-2-20-21 where the petitioner himself says that he worked. There were two periods of temporary disability awarded, August 27-07 to 9-4-07 and then 9-19-07 to 10-18-07. The petitioner testified that he worked during the first period of time and was paid during the first period of time and if he did work during the first period of time, The second period of time, 9-19-07 to 10-18-07, Mr. Bach admitted that he had started his own company at the end of September. He was laid off September 19-07 but then started his own company and there is no definitive date. The arbitrator in the case stopped temporary disability on October 18-07 because that's when a videotape and a receipt from Home Depot showed Mr. Bach purchasing plumbing supplies. But he admitted that he was engaged in his own company prior to that time. So that period of TTD should also be reversed. The big issue in this case is whether an accident occurred in the course of employment. We have Mr. Bach who is a union plumber performing a water heater exchange for his mother-in-law on a Sunday that the company claims they had no knowledge of, they didn't approve, although Mr. Bach certainly had a water heater from Four Seasons and he took the water heater and some tools on a Sunday to his mother-in-law's house. Counsel, to cut to the crux of the matter, obviously your argument hinges to a large extent on the allegation that Beck was lying about the nature of his work for his in-laws, correct? Correct. All right. Well, does it not bring into the issue one of credibility? I mean, is it not within the province of the commission to judge the credibility and believability of the witnesses? It absolutely is. I agree with you. However, in order to judge credibility, you need some basis. Now, the arbitrator, her sole reason for finding the way she did was that she did not believe the testimony of Mr. Frank Franco, the president of Four Seasons, when he said, I didn't authorize it, I never agreed to it, I never got paid for it, and there's an issue with regard to how much money and that kind of thing, whether he charged the appropriate amount and that kind of thing. But he claims he never got the money. The arbitrator, which was confirmed by the commission, indicates that she didn't believe his testimony. And with respect to his wife's involvement in the company, and with respect to whether Mr. Bach was terminated, laid off, and how that occurred, and she used that basis to say, well, if I don't believe his testimony on his wife's involvement and whether he remembers terminating Mr. Bach, then I don't believe anything he said and he must have received the money. I can show you that Mr. Bach never turned in the service ticket that he claims was completed. Now, a service ticket was completed. It's in the record. It's RX4 and PX4. He completed that with his mother-in-law. And if you look to the transcript, C214 and also C141, Petitioner himself testified that when he got hurt, when he hurt his bicep as he was taking this old water heater down, he was in pain. His mother-in-law then called the brother-in-law to come and finish the job. Mr. Bach didn't call Four Seasons to come and finish the job for somebody else to come finish. The brother-in-law was not a licensed plumber. He comes in and he finishes the job. Okay. Well, Mr. Bach is in pain, so then he goes from there and he leaves this packet of information, as he states, in C141, 142, with his mother-in-law, not getting paid. Later in the – and he goes to the hospital, shows up for work the next day, and we have – he's in a sling and everybody asks what happened. Well, if he's in pain, he's going to the hospital. Is it unusual he wouldn't stop to get paid by his mother-in-law? No. No. But here's the good part. He goes back to his mother-in-law's house the following Wednesday. During his lunch hour, and he picks up the service ticket and the $450 payment. He takes that during his lunch hour and he leaves two of the forms with his mother-in-law. It's a three-part form, you know, triplicate. He takes the original front page and he testified that during his lunch hour then he drove back to the shop and he put that front page ticket, the original, on B's desk, an individual named B that was never called to testify. If he did that, how did he have the original form when he spoke to the insurance investigator a month later? Was this brought out before the arbitrator? Yes. And? I don't believe that she appreciated that evidence. But if he had the original ticket when he talked to the investigator, then he could not have turned in the service ticket. Now, he claims he turned in the service ticket and then walked across the hall and gave an envelope of money to the owner. Frank Franco says he never got an envelope of money. Does that mean Frank Franco's testimony is not credible or does that mean that Mr. Bach's testimony is not credible? But let's look at some other things about Mr. Bach's testimony. When he was questioned about his work activities after being laid off, and, again, I can cite your pages, he claims, and he had an opportunity earlier on in the testimony, he was asked, have you ever owned your own plumbing company? And his answer was yes. When was that? His answer was 20 years ago. Well, he didn't mention the fact that he had his plumbing company again in September of 07. So he had an opportunity to come clean with what he was doing between the date of his layoff and the date of the trial. He didn't do it. That's a credibility issue. It took probably four or five pages of cross-examination for him to finally come around to, okay, yes, I have my own plumbing company and I've been doing jobs since I was laid off from this company. So if the credibility should be attacked in anything, it is the credibility of the petitioner because even though the arbitrator says Mr. Franco was obviously not credible in her terms, and then she lists the two things, the wife's role in the company and the termination of the petitioner. And, by the way, the petitioner didn't even know he was terminated. So there's some confusion as to who did it and whether it was done and whether it was laid off or terminated, and that's not something that cuts to the core of Mr. Franco's credibility, and neither is the fact that he didn't want to talk about his wife's role in the company, which at the time of the trial didn't exist anymore. I think you've done a good job of pointing out some inconsistencies and possible impeachments of the testimony of Mr. Back. But, again, the law is that the assessment of credibility and the weight to be given to the evidence is within the commission. So at what point, then, do we decide that the commission has erred in judging credibility? What is their province to do so? I think that there needs to be some basis for the credibility decision. I mean, here we have a situation where no accident was reported. And this is a manager of the company. He didn't report an accident. He knows what the reporting protocols are. Didn't do it. He went to the hospital.  He knows that that's part of the protocol. His own doctor, petitioner's exhibit at page 536, says this is not work-related. He goes to the company the next day, and he tells everybody he's doing a favor for his mother-in-law. There is the evidence in this case is incredibly in respondents' favor with respect to this accident. The manifest way of this case is completely in Four Seasons' favor. Well, let me ask you this. Doesn't arguably his mother-in-law provide some cooperation for his testimony? It isn't like he leaves. Why does he bother to leave a copy of receipt there at all if it's got nothing to do with Four Seasons? Well, his own testimony was that he wanted her to have a warranty in case something happened. Now, why? And this goes to the scratch-and-dent policy of Four Seasons. The policy is we don't install scratch-and-dent water heaters. Why? Because there's too much liability. So what does Mr. Bach do? He takes a scratch-and-dent. He takes the cost of it. He drops it down. And, you know, the flat rate book says you're putting a water heater in. It's $1,150. Flat rate. Sundays, charge more. He was charging her $450. The company denies that. He writes the ticket so he can provide her with a warrant in the event something went wrong with the scratch-and-dent water heater. And he also says that she was selling the house in a couple of years, and he wanted to give her documentation that she's got a new water heater. So he could have purchased the water heater at Home Depot or Lowe's or wherever else and then gone and installed it. That doesn't make Home Depot and Lowe's the employer when he gets hurt. And I think one of the tipping points in this case is who finished the job? The brother-in-law, not an employee of Four Seasons, not a licensed plumber, finishes the job. If he were hurt in a job-related event, he would have called Four Seasons and they would have sent somebody else out there and finished the job. It was a licensed professional plumber. Not done. He knows better than that. He's been a member of the union for 20 or 30 years. So all of these things add up. Service ticket was never provided to the employer. And they could have brought B in. With regard to the pricing, petitioner testified about Keith Culpin. They could have brought him in to testify. I asked for a continuance to have B come in. Because if B is going to say, yeah, I got the service ticket, this is a different case. But he didn't do it. And B didn't come in. And the court wouldn't allow me to bring B in. Petitioner should have brought B in to prove that he gave the service ticket to them. So if the service ticket never got there, did the money ever get there? Maybe Frank Franco was correct. Maybe he never got the money. Does he have to bring B in if he's credible? Is he credible? I mean, we've gone through a lot of things with respect to, you know, how he may not be credible. I mean, he didn't follow the reporting procedures of the company. He, you know, he's doing this job on a Sunday. You know, his own doctor says it's not work related. You're arguing with the finding of the commission that he was found credible. But in terms of practice, you're saying he should have brought B in. Why should he have? If he says, I'm a believable person. I don't lie. And everybody knows that about me. In fact, I'm bringing in a character witness who is a police officer, my neighbor. So I guess what I'm quibbling with, he should have, he should have. It would seem to me that you would want to undermine credibility. It's his burden of proof, number one. Not my burden of proof. But I tried. All I wanted to do was get to the bottom of the case. Not trying to hide anything. Did he turn in the service ticket or not? And his own testimony says that he didn't. His own testimony. He went to get the ticket at lunch with the money. Why wouldn't you, you say you asked for continuance to have B brought in. Why wouldn't you have already checked with her and had her there? If she's the person that gets the ticket and gets the money, you were on notice of that long before. Absolutely. And, in fact, in the first hearing, this was a two-day hearing. In the first hearing, her name came up. And, yeah, absolutely. I mean, there were so many witnesses in this case, and trying to get everybody together at the same time was a difficult proposition. But I have no problem with becoming a testifier. I certainly would have had her there, you know, if I could have. Well, what was preventing you from having her there? In fact, in fact, the court itself tried to limit the witnesses at the end of the first hearing to the people that were already there. And they had everybody make a list. And I said, well, if I have to make a list of all the witnesses, then I'm going to add some people in. Now, B wasn't there the next day. I can't, you know, the petitioner didn't call her, and I didn't call her. I tried to call her. She works for you. The company was out of business at the time. And the company went out of business on January 8th. So scrambling to get everybody together was a difficult proposition. But she certainly wasn't under the control of the petitioner. No, certainly not. At that point, she was under the control of anybody. But getting back to the service ticket, if you look at his own testimony, it is impossible for him to have turned in the service ticket. Impossible. He went straight from her house to the shop, turned in the ticket. His mother-in-law had the other two parts of it. How, then, is it possible that he had the original copy a month later when he spoke to the investigator and gave the investigator a copy? How is that possible? It's impossible. So he never turned in that ticket. And if he never turned in that ticket, he never turned in the money, and Frank Franco was correct. The manifest way to the evidence in this case, Your Honors, is in four seasons. Your conclusions could only be based on if B testified. You drew that inference based on the fact that he's got the original of the receipt. That doesn't preclude he didn't turn in $450 and she gave him the receipt back. He never said that B got it. He said he laid it on her desk. It was lunchtime. It was busy. Laid it on her desk. Well, if he laid it on her desk, he didn't testify. He made a copy of it first. He laid it on her desk. It's impossible for him to have had that copy, so he never turned it in. Well, turn that around. How do we know that the money wasn't turned in? We know the money wasn't turned in because Mr. Franco said he never received it. What about if he left it on the desk somewhere? Well, he says he handed it to him directly. So he didn't leave it on his desk. He said he handed it to him directly, and then he said some other person, Brian Kastick apparently, was supposed to get part of the money or something, and he claims that the following day he got some of the money, but he never brought that person in to testify. He testified he gave it to Franco. Franco denies it, right? Correct. And didn't the arbitrator find that Franco was not criminal? Not on that basis, though. On the basis he didn't want to talk to him about his wife's involvement in the company. And now remember, now the trial occurred, the company is defunct. It's gone. And he wasn't clear about whether he terminated Mr. Bach, whether it was laid off, whether he gave authorization to do it or not. And the funny thing about that is, and if you look at page C-167, petitioner himself testified that he doesn't know if he was laid off or terminated. So he's unclear about whether he was laid off or terminated in September of 2007. Mr. Franco is uncertain about it. Does that make his testimony not credible? I think if you believe, Mr. Bach, that he turned in the service, that he doesn't need the person he turned it into to come in and testify to whether they received it, then maybe you've got something there. But the problem is the evidence is completely on the other side, and there is no way around it. All right. Counsel, you'll have time on rebuttal. Thank you very much, Your Honor. We ask that the matter be overturned. Counsel? If it pleases the Court, Counsel, essentially, Your Honor's questions do go to the heart of it. This is a credibility. Who are you? I'm sorry. I'm David Ackman. I'm attorney for the petitioner. My apologies, Your Honor. The commission, as you all know, in the Caterpillar case, instructs as the function of determining the credibility of the witnesses and resolving conflicts of testimony. What counsel is asking you to do on behalf of the respondent is essentially replace his version of truth with what the commission found. How did he wind up with the original receipt when the insurance adjuster showed up, if he turned it in? Well, that, too, is a credibility question. Credibility question? It may be an impossibility question. The question, you know, commission decides credibility, but they can't decide that the world is flat. Specifically, Bach testified he didn't have the original white copy when he met with Schmidt. Schmidt testified differently. One of them is telling the truth. One is not. I cite that on page 9 of the brief to give the page numbers regarding that testimony. I specifically called him on rebuttal and asked him that specific question. Did you present the original receipt to Mr. Schmidt when he met with you? No, he did not. It was his testimony that's in the record. Did Schmidt produce a Xerox copy of that receipt when he testified? There was, I think, three different copies of the receipt that people had. Respondent offered one. Also had another one that was marked but not offered. Petitioner's was Petitioner's 4. I think it's Respondent's 4. And I know the arbitrator references it in her decision, which it is. But once again, you have Petitioner saying, no, I did not present the original receipt when the adjuster or the investigator from the Respondent came. I mean, as I read this, the copy that the insurance adjuster got was in color. There was some color on the copy that could have only come from the original receipt. Am I misreading the record or is that a testimony? That was his testimony. Did he present that receipt? What he presented that's part of the record before the court was Respondent's exhibit 4. We had two different versions of what happened on that day. In other words, what the color was. Do we know the color of the original receipt or don't we know the color of the receipt? There was also an original blank receipt that isn't evidence. Is it the same color as the copy that the insurance adjuster had? Well, no, I don't believe so. I don't think any – there's no original front cover of anything produced with writing on it except a blank one. My question was the blank one is color, the original of the blank one. Top copy of the blank one is a certain color. Is the Xerox copy that was presented during the testimony of the insurance adjuster the same color as that blank top copy or is it a different color? I would say no, but obviously both are in the record for your honors to view as were before the arbitrator commission and trial court as well. Opposing counsel has pointed out that Mr. Gott called his brother-in-law to finish the work. What is your take on that issue relative to whether or not this was a job performed for four seasons? Well, it certainly would be a factor to be considered, quite honestly. But when you look at the testimony as a whole, this was work performed on a Sunday. There was familiarity between the parties without question. Mr. Bach did say, by recollection of his testimony, was that he remained and instructed the person on what to do, probably finish it and get to the hospital where his arm obviously needed attention. My own view of the evidence is that what matters is what he was doing at the time of his injury and not subsequent to that versus the rising out of it in the course of it. Next question I have for you. What about this first section of this first period of TTD? I think it's eight days, isn't it? Well, again, page nine of the arbitrator's decision, paragraph five, it indicates her basis of the finding, PX6, were the wage statements. He worked eight hours a week and was paid $316. Out of those five days, she found that respondents stipulated in the stipulation that made no payments for TTD, and she found that, therefore, a respondent was not entitled to credit. I mean, I don't understand. He gets to work and get paid, plus he gets TTD during that period? I mean, I don't understand. He worked the equivalent of one day. Well, then why did he get eight days and not seven days? I mean, that doesn't make any sense. Well, Your Honors may recall my previous middle of a proposed decision was different, but this is what the arbitrator in question found. I mean, does that make sense to you? I mean, if you've got an eight-day period and the guy worked one of the eight days and can't work the other seven, it occurs to me he gets TTD for seven days, not eight days. Well, I can tell Your Honor what I might have written when I was on the commission, but I can't sit here in good faith and argue why that should be on that day. Okay. But the $300 and some odd is one day's pay? Yes. That's one day's pay. All right. And that's PX6, Your Honor. That's the wage. As to the cutoff, Mr. Bach did testify that he goes from $110,000 to zero. He's essentially thrown under the bus. He's injured. He has no way to earn a living. He starts his own company. I believe he said sometime in the end of September or early October in questioning, when the arbitrator arrived at a specific day and cut off TTD, there was some activity on that issue in the tribunals below, Your Honors. And what's before the court now is that particular period of TTD that I believe she said October 18th or 19th. She was not clear in her opinion nor did the commission comment in its decision on which day, why that particular day was chosen. I don't dispute counsel's suggestion to the court that that's where that day arrived. But he did, in fact, testify. He supervised, if you will, three or so jobs. He also testified he didn't receive any money for those jobs in the time period, but that was all part of the testimony. The essence of the issue before the court is one of these gentlemen is telling the truth and one is not. Mr. Bach testified that he got permission from Franco, who ran the business, for the price, for doing it, for how and when it was done. Mr. Franco doesn't recall any of it. Mr. Bach testified he got $450 from his mother-in-law, who the work was performed for. Mr. Bach says he doesn't know anything about $450, or Mr. Franco says he didn't know anything about $450. Mrs. Camp, the mother-in-law, testified she did pay $450. There are, I believe it's Petitioner 7, the cell phone records that were admitted that do show the cell phone calls that the petitioner testified to. It isn't just, there's absolutely nothing in this record that would support the decision. If you find that Mr. Bach is credible, then all the necessary elements are present. He received a call for a business order, provided that business order. He worked seven days a week. He did not keep hours, never. He worked many Sundays, not all, but many, at odd hours. At the time he was injured, he worked 30 to 40% of his time in the field. And for a respondent to be successful, the conclusion is inescapable that you would have to essentially replace his version of credibility and conflict resolution in his favor and ignore that of the commission. Petitioner would respectfully ask that you decline to do so in keeping with the law and line of cases and affirm the judgment of the circuit court and the head of the commission. Thank you, Counsel. Rebuttal, please. With respect to the color of the original service ticket, it was very clear in the record from the testimony of Mr. Brad Schmidt that the original was red, red, white, and blue was written in what he described as ink. Mr. Bach took that or showed him the original, and there's no indication that Mr. Schmidt's testimony is not credible. Showed him the original, went back into his house, made him a color copy. If he showed Mr. Schmidt the original. My question was, was the quote-unquote color copy introduced into evidence, and is it the same color as the original copy of a receipt that's in evidence? The color copy was submitted into evidence, and it's an orange color, not red. It was clearly the color, and that was testified to by Mr. Schmidt. So the copy that Mr. Schmidt said that he got when he went and talked to Mr. Bach is a different color than the original. Yes. Of the receipt form set that's been introduced in evidence. The copy that Mr. Schmidt had was a faded red, and that's the copy that Mr. Bach gave him after he went inside and made a copy of the original. What about the other copies in the form set? What color are they? Yeah, there's a response exhibit that has a blank form just to show the court what the original looked like so you can see it. What about the copies? What color are they? There's, you mean the other two parts? Yes. There's a white, red, white, and blue is the original top page, then there's a yellow page, and then there's a manila card, like a, it's almost like a manila folder type thing on the bottom. So, again, if he had that at the time, he didn't say he made a copy of it anywhere. He said he picked it up from his mother-in-law with the money and went straight to the company and threw it on B's desk or placed it on B's desk. He doesn't know if she ever received it. So how did he have it? And how did he have a copy of it then? What was the third copy? You said it was a manila color? It's a manila color. Kind of like a file folder type. And is it also multicolored? No. No. You write on the top and it goes through, and the writing comes through to all three. When Mr. Schmidt interviewed Ms. Camp, Mr. Bach's mother-in-law, she showed him the documentation, and it was the yellow middle copy and the cardboard bottom copy of that three-part form. So she had two, and Mr. Bach even testifies that he left her two, and he testifies he took the original back and put it on B's desk, didn't see her, doesn't know if she received it. But then how would he have even a copy? How would he have a copy of it? If Mr. Bach showed Mr. Schmidt a copy of the original, how did he have the copy? Did Mr. Bach admit giving a copy to Mr. Schmidt, or did he deny it? No. He admits giving him a copy. A copy. He copied it. So it was copied from something. Correct. Okay. In Mr. Schmidt's testimony, it was copied from the original. So if he's got the original, was anything turned in? I think not. And I think, you know, that's a piece of the case that then it turns everything, because if he never turned that in, where are the other things turned in? You know, Mr. Schmidt that did the investigation, when he was doing that, D was still working there. The company was still in force. Yes. That's correct. And he never went to check with D whether she got the original or the money, or there was any record of this transaction? There's no evidence that he testified to that. I do not believe that he testified. He spoke with B. He spoke with Mary DeFrancisco. He spoke with Frank Franco, Jose Ebatua. And, by the way, Jose Ebatua is Mr. Bach's friend. How do you get around his testimony? It says he never knew about it. He never knew about the job, and he didn't authorize it either. But the only person that would have known if it was turned in or on her desk was D, and he never asked that question, or at least he never testified whether he did or not. Right. And I'm suggesting to the court that it's irrelevant at this point, based on Mr. Bach's own testimony that he had the original, he went straight from his mother-in-law's house to the company, and he left it on B's desk. How does he even have a copy? Thank you, counsel. Thank you. The court will take the case under advisement for disposition.